Filed 9/2/15  P. v. Christian CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059966 |
| v. | (Super.Ct.No. RIF1201183) |
| CORY MICHAEL CHRISTIAN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge.  Affirmed.

Suzanne G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles Ragland, Scott C. Taylor, Meredith S. White, and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

Appellant and defendant Cory Christian (defendant) and codefendant Vincent Robert Avila, who is not a party to this appeal, were tried together and convicted of kidnapping for robbery[1] and carjacking.[2] The jury found true as to both counts special allegations that codefendant had personally used a knife in the commission of the offenses.[3] Defendant was sentenced to seven years to life in prison.

Defendant appeals from judgment entered against him on the ground the trial court erred in denying his motion challenging the prosecutor's exercise of peremptory challenges to three African American jurors (*Wheeler* motion), in violation of principles set forth in *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). Defendant contends the trial court violated his rights to equal protection and trial by a representative cross-section of the community.

Giving deference to the trial court's findings because the trial court is in the best position to evaluate the credibility of the prosecutor's explanations, we conclude the trial court made a sincere and reasoned effort to evaluate the prosecutor's race-neutral justifications for excusing the three prospective jurors, and therefore did not err in denying defendant's *Wheeler* motion.

---

[1] Penal Code section 209, subdivision (b)(1); count 1. Unless otherwise noted, all statutory references are to the Penal Code.

[2] Section 215; count 2.

[3] Section 12022, subdivision (b)(1).

## II

## FACTS

Because the sole issue raised on appeal concerns jury selection, a detailed statement of the facts is unnecessary. A brief summary of the facts relating to the charged crimes is provided as follows.

On January 24, 2012, Avila and defendant (collectively referred to as defendants) approached Jarrad Reyes in the Riverside Metrolink station parking lot. Reyes was a 20-year-old college student who had just gotten off the Metrolink in Riverside at around 5:40 p.m. As Reyes approached his car, defendants asked Reyes for a ride. Reyes said no. As Reyes got into his car, Avila pushed him in, put a knife to Reyes's chest, and threatened to kill him if Reyes made any noise. Defendant sat in the rear passenger seat and Avila got in the front passenger seat. Defendants ordered Reyes to drive them out of the Metrolink station parking lot. Several blocks away, defendants forced Reyes into the back seat and Avila got into the driver's seat. Defendants robbed Reyes of his watch, wallet, iPhone, hat and sweatshirt. Avila drove to an ATM and attempted to force Reyes at knifepoint to withdraw cash. Reyes managed to escape and get help.

Two unauthorized ATM withdrawals, totaling $300, were made from Reyes's account, using Reyes's debit card. Reyes identified defendants from ATM surveillance footage. Avila was wearing a sweatshirt and hat he had taken from Reyes. Reyes's car was recovered that night in a parking lot a short distance from the ATM. A knife and ATM card were recovered from the vehicle.

## III

## VOIR DIRE PROCEEDINGS

The trial court began voir dire by calling the names of 24 prospective jurors for the jury panel. The names included African Americans, C.G. and D.S. The judge asked the prospective jurors to state if they knew anyone in the courtroom, such as courtroom staff, the judge, lawyers, or any witnesses, including a police officer, two police detectives, and a sheriff's department employee. The court also requested the jurors to each respond to questions regarding the jurors' personal background, including residence, marital status, occupation, number of children and ages, past jury experience, service in the military and rank, highest level of education, and whether the juror believed he/she could be fair and impartial.

C.G. stated he was 18 years old. He then answered the court's general questions succinctly. The court asked a few follow-up questions, which C.G. answered appropriately. D.S. stated he had been retired for eight years. His previous occupation was facility maintenance engineer. His spouse was also retired. She had worked for Riverside County. He had never been on a jury. He served in the U.S. Marine Corps, with an honorable discharge as a corporal. He had an AA college degree in business administration.

The court asked if the prospective jurors knew anyone in law enforcement and, if so, to state the person's relationship to the juror and whether the juror's relationship would have any impact on the juror's ability to be fair and impartial. C.G. responded that his father had worked for the LAPD for over 20 years but would be retiring soon. C.G.

4

believed he could still be fair and impartial. C.G. responded briefly and succinctly to the court's two follow-up questions as well.

The court asked the jurors if anyone had had any negative experiences with law enforcement, such as getting harassed or getting a ticket, which the juror believed he/she did not deserve. D.S. said he had received a traffic ticket he believed he did not deserve. The ticket was for parking at a Los Angeles County beach because he did not purchase a parking pass, but he was parked in a handicapped zone with his placard displayed. The ticket was "ongoing." D.S. said he did not believe the matter would impact him in the instant case.

The attorneys then questioned the jurors. Defendant's attorney, Cohen, asked each juror to state one word about him or herself that would make a good juror. Cohen told the jurors they could not use a word another juror had already stated. C.G. said, "Honest." D.S. also said, "Honest." Cohen noted someone else had already used the word. D.S. said, "Impatient." Cohen said, "All right," and D.S. replied, "Got you."

Cohen asked the jurors why someone charged with a crime might choose not to testify, and discussed signs of nervousness when testifying, such as sweating, shaking, confusion. Cohen asked the prospective jurors what they would think if a witness, who was charged with a crime, was sweating, shaking, and confused. D.S. said, "Nervous." Another juror said, "Guilty."

Avila's attorney, Dorr, asked what the jurors would do if at that moment he asked them to vote whether defendant was guilty. After a couple of jurors responded, Dorr asked C.G. to respond to the question. C.G. said "I would need the evidence." Dorr told

the jurors that, in order to find the defendant guilty, every element of the crime must be proven. Dorr asked if D.S. agreed. D.S. said yes. Dorr asked C.G. and D.S. if there was any reason to find the defendant not guilty, if the People had not proven their case beyond a reasonable doubt. C.G. and D.S. said no.

The prosecutor questioned the jurors as well. C.G. and D.S. were not individually questioned and did not make any statements in response to any of her questions directed to the jury as a whole.

After the court and counsel completed questioning the prospective jurors, counsel all passed on excusing the jurors for cause. Next, counsel alternated exercising peremptory challenges. The prosecutor used six peremptory challenges, including excusing D.S. and C.G. Defense counsel jointly also exercised six peremptory challenges. There were 11 jurors remaining on the jury panel. Twelve jurors were needed plus two alternates. The trial court called 13 more prospective juror names, including B.K. The first prospective juror was placed in the jury box. The court asked the new prospective jurors the same preliminary questions as were asked of the initial panel. B.K. stated she was a registered nurse for almost 21 years.

The court asked if the new prospective jurors knew anyone in law enforcement. B.K. said her cousin's partner was a retired deputy district attorney, a cousin was in the public defender's office, and a friend back east worked in the department of corrections. B.K. added: "And with my job, I do come in contact with Riverside Police Department very sporadically, . . ." B.K. said she worked as a registered nurse, currently as a director of nursing, of a 120-bed psychiatric facility. "So quite frequently, we may have the

6

police department . . . at our facility." B.K. said she believed neither her work nor relationships would impact her ability to be fair. In response to the court inquiring whether any of the prospective jurors had been a victim of the type of crimes charged in the instant case or knew anyone who had, B.K. said her car was stolen 22 years ago but she did not believe it would impact her ability to be fair.

Dorr asked B.K. what she would do if asked if defendant was guilty. B.K. said she would say he was not guilty because he was innocent until proven otherwise, because she had not heard any evidence. She agreed the evidence comes from witnesses testifying on the witness stand, not from the judge or attorneys.

During questioning, the prosecutor discussed bias, including racial bias. The prosecutor asked the prospective jurors if anyone felt racial bias might be an issue. The prosecutor said to B.K. that she did not see B.K. "nod either way." The prosecutor asked B.K. if she had said she was a registered nurse in a psychiatric facility. B.K. said yes. When asked if B.K. had ever had the opportunity to work with law enforcement, B.K. said yes but "only when things get so out of control and we're not able to handle it. The kind of facility I work in, we don't have certain things that other facilities may have to contain." The prosecutor asked B.K. if some officers handled situations better than others. B.K. responded, "Absolutely." When asked if B.K. could put her view of those officers who did not handle situations well aside and evaluate the facts in the instant case, B.K. said, "I can because I have to in my everyday world." The prosecutor asked if B.K. had any bias regarding law enforcement. B.K. said no.

7

After the court and counsel completed questioning the prospective jurors and counsel passed on excusing the prospective jurors for cause, counsel alternated exercising peremptory challenges. The prosecutor and the defense, acting jointly, each exercised five peremptory challenges. The prosecutor then accepted the jury panel as constituted. One of the five prospective jurors whom the prosecutor excused was E. P., a registered nurse at Patton State Hospital. Defense jointly excused another prospective juror. The prosecutor again accepted the panel. Defense jointly excused an additional prospective juror, who was replaced by B.K. The trial court informed counsel that the People had used 11 peremptory challenges and the defense had used 13. The prosecutor then excused B.K.

## A. Defendants' Wheeler Motion

Out of the presence of the prospective jurors, Dorr made a *Wheeler* motion and moved for a new trial. Dorr stated his client, Avila, was African-American and the prosecutor dismissed all three African-American prospective jurors. The three jurors dismissed were C.G., D.S., and B.K. (the three jurors). Dorr argued there was no valid reason for the prosecutor dismissing them. Defendant's attorney, Magdalena Cohen, agreed and joined in the *Wheeler* motion. Cohen added that she understood why C.G. was dismissed. He seemed like an "eager, young juror." Cohen noted, however, C.G. answered questions openly and honestly. Cohen stated she was surprised the prosecutor dismissed B.K. Cohen acknowledged defendant was not African-American but believed the prosecutor had systematically excluded African-American jurors.

8

The trial court confirmed no African-Americans had been accepted on the jury. The prosecutor responded that Avila was likely African-American and Hispanic, based on his last name, and there were several Hispanic jurors on the jury. The prosecutor argued this showed she was not dismissing jurors based on their race.

The trial court found there was a prima facie showing of group bias. The court requested the prosecution to provide race neutral reasons for excusing the three African-American jurors. The prosecutor responded that she excused C.G. because he was over-eager, answered questions not asked, and did not stay focused. She excused D.S. because he was grumpy, he had a bad attitude, he would not make eye contact, and she felt she could not connect with him. The prosecutor said she excused B.K. because she worked at a psychiatric hospital as the director of the nurses and observed officers mistreat patients. The prosecutor was also concerned B.K. would be sympathetic to defendant because of his drug habit, which was why defendant committed the crimes.

The trial court denied defendants' *Wheeler* motion. The court stated it disagreed with the prosecutor's explanation for excusing the three jurors but noted the standard is subjective. Therefore, as long as the trial court believed the prosecutor's stated reasons for removing the jurors were sincere and the prosecutor was not discriminating against a particular race, such as African Americans, the motion must be denied. The prosecutor was only required to identify facially valid neutral reasons why she excused the three prospective jurors. The court cited *People v. Hall* (1983) 35 Cal.3d 161 (*Hall*), *People v. Silva* (2001) 25 Cal.4th 345 (*Silva*), and *People v. Long* (2010) 189 Cal.App.4th 826. The court stated that, as to C.G., the prosecutor's reasons, of C.G. being young, a little

9

immature, and lacking life experience, were sufficient to justify his dismissal. As to D.S., the court stated he did appear to be "somewhat grumpy" but the court did not find there was anything wrong with D.S. The court nevertheless concluded the prosecutor was justified in excusing D.S. under the standard for removing jurors.

The trial court stated that removal of B.K. "is a bit of a stretch" but acknowledged that the prosecutor's justification, which was based on a subjective hunch that B.K. would be sympathetic to defendant's drug use, was proper. The court noted that the prosecutor's hunch was speculative that B.K. had a negative view of law enforcement, based on the manner in which law enforcement treated psychiatric patients when delivering them to the psychiatric hospital.

The court warned the prosecutor that if she dismissed another African American from the jury there was a good chance the court would grant a *Wheeler* motion. The court stated it was close to granting the instant motion but denied the motion. The prosecutor responded that she had dismissed prospective juror, E.P., who was a Hispanic male, for the same reason as B.K. E. P. worked at Patton as a registered nurse. The prosecutor had a hunch nurses at psychiatric hospitals do not like law enforcement. The prosecutor based this on her prior experience speaking with jurors in previous hung jury cases. The court noted there was at least one more African American left in the venire.

B. *Resumption of Voir Dire*

After the trial court heard and denied defendants' *Wheeler* motion, the court resumed voir dire proceedings. The names of 13 additional prospective jurors were

called. The court and counsel questioned them as was done with the other prospective jurors.

After a couple of jurors were excused for cause, the trial court noted defense had used 13 peremptory challenges and the People had used 12. Defense jointly exercised an additional peremptory challenge. The prosecution accepted the panel. Defense jointly excused two more prospective jurors. Thereafter the parties all accepted the panel as constituted. After jury selection was completed, the trial court stated that, because of the *Wheeler* motion, it was important to note on the record that there were two African American female jurors on the jury, against whom the prosecutor did not exercise peremptory challenges.

### III

### *WHEELER* MOTION

Defendant contends the prosecutor discriminated by excusing three African American jurors, C.G., D.S., and B.K., and the trial court erred in denying his *Wheeler* motion. Defendant argues the race-neutral reasons the prosecutor gave for excusing the three African American jurors were unsupported or contradicted by the record and were implausible. This raised serious questions regarding the legitimacy of the prosecutor's reasons for excusing the jurors. Defendant also argues the trial court erred in failing to make a sufficiently probing inquiry to determine whether the prosecutor's explanations for removing the jurors were justified or pretextual.

*A.  Applicable Law*

A prosecutor's use of peremptory challenges to strike prospective jurors because of group bias (i.e., bias based on the juror's membership in a racial, religious, ethnic or similar group) violates a criminal defendant's right to trial by a jury drawn from a representative cross-section of the community under both the Fourteenth Amendment to the United States Constitution and article I, section 16 of the California Constitution. (*People v. Bell* (2007) 40 Cal.4th 582, 596; *People v. Chism* (2014) 58 Cal.4th 1266, 1313 (*Chism*).)  Ruling on a *Wheeler* motion requires a three-part inquiry.  First, the defendant must make a prima facie case by showing that the totality of the circumstances gives rise to an inference of discriminatory purpose.  Second, if the defendant does so, the burden shifts to the prosecution to adequately explain its peremptory challenges by offering group bias-neutral justifications for the strikes.  Third, if such an explanation has been given, the trial court must decide whether the defendant has proven purposeful discrimination.  (*Chism,* at p. 1313.)

In making this decision, "the trial court must make a 'sincere and reasoned attempt to evaluate the prosecutor's explanation' to determine whether the proffered reasons are bona fide." (*People v. Perez* (1994) 29 Cal.App.4th 1313, 1327 (*Perez*).)  "Under *Wheeler,* there is a presumption that a prosecutor uses his peremptory challenges in a constitutional manner.  [Citation.]  . . .  Under both *Wheeler* [citation] and *Batson* [citation], the defendant need not be a member of the group in question in order to complain." (*People v. Alvarez* (1996) 14 Cal.4th 155, 193.)

12

When reviewing the prosecutor's showing, the trial court may consider "'"how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy."'" (*People v. Huggins* (2006) 38 Cal.4th 175, 233 (*Huggins*).) The prosecutor may justify the challenges by showing that they were exercised "'on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses – i.e., for reasons of specific bias,'" or by referring "'to the totality of the circumstances'"; for example, "'demonstrat[ing] that in the course of . . . voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds.'" (*People v. Reynoso* (2003) 31 Cal.4th 903, 915 (*Reynoso*).) The prosecutor's justification need not rise to the level of a challenge for cause, and "even a 'trivial' reason, [or a hunch,] if genuine and neutral, will suffice." (*People v. Arias* (1996) 13 Cal.4th 92, 136.) For example, a trial court may credit a prosecutor's claim of a nondiscriminatory motive based on such matters as "'the prospective jurors' body language or manner of answering questions.'" (*Reynoso, supra,* 31 Cal.4th at p. 917.) "The proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons." (*Id.* at p. 924.) However, "'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'" (*Id.* at p. 916.)

"'A reviewing court's level of suspicion may also be raised by a series of very weak explanations for a prosecutor's peremptory challenges. The whole may be greater than the sum of its parts. When a number of jurors are struck, "[a]n explanation for a

13

particular challenge need not necessarily be pigeon-holed as wholly acceptable or wholly unacceptable.  The relative plausibility or implausibility of each explanation for a particular challenge . . . may strengthen or weaken the assessment of the prosecution's explanation as to other challenges and thereby assist the fact-finder in determining overall intent."'''"  (*People v. Mills* (2010) 48 Cal.4th 158, 182, fn. 6.)

Because *Wheeler* motions call upon trial judges' personal observations, we give great deference to the trial court's findings under the third step of this analysis (*Batson, supra,* 476 U.S. at p. 98, fn. 1), and review the trial court's evaluation of proffered nondiscriminatory reasons for substantial evidence (*People v. McDermott* (2002) 28 Cal.4th 946, 971).  "So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal."  (*People v. Burgener* (2003) 29 Cal.4th 833, 864.)

The fundamental inquiry is:  "[i]s there substantial evidence to support the trial court's ruling that the prosecutor's reasons for excusing prospective jurors were based on proper grounds, and not because of the prospective jurors' membership in a protected group?  If so, then defendant is not entitled to relief.  In undertaking this inquiry, we note that the question is not whether we as a reviewing court find the challenged prospective jurors similarly situated, or not, to those who were accepted, but whether the record shows that the party making the peremptory challenges honestly believed them not to be similarly situated in legitimate respects."  (*Huggins, supra,* 38 Cal.4th at p. 233.)  Accordingly, we confine our inquiry to whether the prosecutor here honestly found pertinent and legitimate reasons for excusing the three jurors.  (*Ibid.*)

14

*B. Credibility of the Prosecutor's Race-Neutral Reasons*

Defendant argues that, although the prosecutor satisfied stage two of the *Wheeler* process by giving race-neutral reasons for excusing each of the three jurors, the stage three requirement was not satisfied because the reasons given were not plausible and thus were pretextual.

The proper focus in ruling on the validity of the prosecutor's reasons is the subjective genuineness of the nondiscriminatory reasons stated by the prosecutor, not their objective reasonableness. (*Reynoso, supra,* 31 Cal.4th at p. 924; *Chism, supra,* 58 Cal.4th at p. 1317.) At the third stage of the *Wheeler* analysis, "'"[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."' [Citation.] In reviewing a trial court's denial of a *Batson/Wheeler* motion, we examine 'only whether substantial evidence supports its conclusions.' [Citation.] '"We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]"' [Citation.]" (*Chism, supra,* 58 Cal.4th at pp. 1314-1315.)

Great deference is given to the trial court's findings because, "[w]ithout audio-visual recordings of jury voir dire, appellate courts must review a prosecutor's exercise of

15

peremptory challenges without all the behavioral information available to the trial court. This institutional limitation is part of what underlies the deference traditionally accorded the trial court, exemplified by the following comments of the California Supreme Court. 'Since the trial court was in the best position to observe the prospective jurors' demeanor and the manner in which the prosecutor exercised his peremptory challenges, the implied finding, that the prosecutor's reasons for excusing [a prospective juror], including the demeanor-based reason, were sincere and genuine, is entitled to "great deference" on appeal.' [Citation.]" (*People v. Long* (2010) 189 Cal.App.4th 826, 845 (*Long*).)

However, doubt may undermine deference "when the trial judge makes a general, global finding that the prosecutor's stated reasons were all 'legitimate,' and at least one of those reasons is demonstrably false within the limitations of the appellate record. A trial court 'should be suspicious when presented with reasons that are unsupported or otherwise implausible.' [Citation.] 'Although an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent [citation], it is another matter altogether when, as here, the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to probe the issue [citations]." (*Long, supra,* 189 Cal.App.4th at p. 845.) "When reasons are given for the exercise of challenges, an advocate must 'stand or fall on the plausibility of the reasons he gives.' [Citation.] The plausibility of those reasons will be reviewed, but not reweighed, in light of the entire record. [Citation.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 621 (*Lenix*), citing *Miller-El v. Dretke* (2005) 545 U.S. 231, 252, 265-266.)

16

Here, the record of voir dire provides support for the prosecutor's stated reasons for exercising the peremptory challenges against the three jurors, and the trial court sufficiently probed those reasons. The trial court's remarks indicated the court was skeptical of the prosecutor's reasons for exercising the peremptory challenges, appropriately examined the facts as disclosed by the jurors' voir dire responses, and evaluated the credibility of the prosecutor's race-neutral reasons. We conclude, as discussed below, the trial court met its obligation to make a sincere and reasoned attempt to evaluate the prosecutor's nondiscriminatory justifications offered, and the trial court's findings are supported by substantial evidence. (*Long, supra,* 189 Cal.App.4th at p. 845; *Silva, supra,* 25 Cal.4th at p. 385.)

**1. C.G.**

Defendant argues the trial court failed to consider whether the prosecutor's reasons given for excusing C.G. were genuine, as opposed to pretextual. Defendant argues this is apparent because the prosecutor's reasons for excusing C.G. were contradicted by the record. The prosecutor stated she excused C.G. because he was young, over-eager, and unfocused.

The prosecutor explained to the court that C.G. was 18 years old and appeared over-eager answering questions. He provided information that was not requested, which made Drake nervous. The court asked how C.G. was over-eager. Drake said C.G. answered questions that were not asked. The court asked for an example. Drake stated, "Does everyone want to know how old I am? I'm 18." Drake added she did not like C.G.'s answers. She thought he was too young. The court asked Drake how that

17

indicated C.G. would hold her to a higher standard. Drake responded that she was required to prove several complicated elements and anticipated defense counsel would raise numerous "red herrings," things she did not "necessarily have to prove, to attempt to mislead the jury into things they should focus on that are either irrelevant . . . or aren't elements of each crime. I don't want a young, over-eager juror to take credence in those things and to focus on things they don't need to be focusing on. I want them to stay on task. He appeared a little immature to me, young, and not focused on the questions that were asked when I spoke with him."

Although it is not apparent from the record that C.G. was over-eager and unable to focus, these characteristics may be deduced based upon facial expressions and gestures, which are not apparent from the record. (*Lenix, supra,* 44 Cal.4th at p. 613.) As our high court noted in *Lenix,* "There is more to human communication than mere linguistic content. On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact. 'Even an inflection in the voice can make a difference in the meaning. The sentence, "She never said she missed him," is susceptible of six different meanings, depending on which word is emphasized.' [Citation.] '[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record.' [Citation.]" (*Lenix, supra,* 44 Cal.4th at p. 622.)

18

Furthermore, even if there was insufficient evidence C.G. was unable to focus, "an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent." (*Silva, supra,* 25 Cal.4th at p. 385; in accord *People v. Williams* (1997) 16 Cal.4th 153, 189.)

In addition, there was substantial evidence establishing that defendant was a very young, inexperienced juror. C.G. stated he was 18 years old, single, in college, and had never served on a jury. The prosecutor stated she was concerned that because of C.G.'s youth, he might not understand complicated elements and be more easily misled by irrelevant facts and argument. Avila's attorney, Cohen, acknowledged during the *Wheeler* motion hearing that she understood why the prosecution excused C.G.. Cohen stated that C.G. seemed like an "eager, young juror." Defendant's attorney, Dorr, also indicated C.G. appeared over-eager.

C.G.'s youth constituted a valid race-neutral reason for excluding a juror. The California Supreme Court in *People v. Sims* (1993) 5 Cal.4th 405, 430, found no *Wheeler* violation when a prosecutor exercised peremptory challenges to two jurors because one was a youthful college student and the other juror was very young and appeared immature. (In accord *Perez, supra,* 29 Cal.App.4th at p. 1328 ["Limited life experience is a race-neutral explanation."]; *People v. Henderson* (1990) 225 Cal.App.3d 1129, 1153 [young people do not constitute a cognizable class for *Wheeler* purposes]; see also *People v. Salcido* (2008) 44 Cal.4th 93, 143.)

The record does not support defendant's contention the trial court failed to inquire to determine whether the prosecutor's reasons for excusing C.G. were genuine or

19

improperly motivated. It was quite apparent and undisputed C.G. was a young juror. Furthermore, the trial court asked the prosecutor several follow-up questions, including asking for specific examples to support the prosecutor's conclusions. The court asked how C.G. was over-eager. The prosecutor said C.G. answered questions that were not asked. The court asked for an example. The prosecutor stated, "Does everyone want to know how old I am? I'm 18." The court asked the prosecutor how that indicated C.G. would hold her to a higher standard. The prosecutor responded that she was required to prove several complicated elements and anticipated defense counsel would raise numerous "red herrings" in an attempt to mislead the jury into focusing on irrelevant factors.

Giving deference to the trial court's findings, as we must, we conclude the trial court made a sincere and reasoned effort to evaluate the prosecutor's nondiscriminatory justifications for excusing C.G. We also conclude there was substantial evidence to support the trial court's finding that the prosecutor's race-neutral reasons were credible and genuine, and insufficient evidence of pretext. While the record does not show C.G. lacked focus, this alone, is an insufficient basis for this court to reject the trial court's factual finding there were race-neutral reasons for excluding C.G. There other reasons for removing C.G. supported by substantial evidence, and this court must give deference to the trial court findings on credibility.

**2. D.S.**

The prosecutor stated she excused D.S. because he was "very disinterested. He would sit there looking down. He wouldn't make eye contact. He appeared in a bad

20

mood. He had a bad attitude when I spoke with him. That led me to wonder what -- . . . issues, because I don't know if he had an issue, what his problem was, . . . He concerned me when Ms. Cohen asked him what are reasons that somebody may not take the stand and his answer was 'Misunderstood.' And it just seemed like an odd answer to me, something maybe in the back of his mind when he entered the courtroom. And when I spoke with him, I just didn't have a connection with him. I couldn't get him to come out of being grumpy. He just didn't appear like he wanted to be here."

The record shows there was substantial evidence that the prosecutor excused D.S. based on the race-neutral demeanor-based justification, that D.S. was grumpy and appeared to have a disinterested, bad attitude. The trial court acknowledged D.S. appeared "somewhat grumpy." Even though the court stated it did not find anything wrong with D.S., the trial court appropriately focused on the subjective genuineness of the prosecutor's nondiscriminatory reason, rather than on its objective reasonableness (*Reynoso, supra,* 31 Cal.4th at p. 924), and found that the prosecutor's race-neutral explanation was credible, sincere, and genuine. (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 339.) "Since the trial court was in the best position to observe the prospective jurors demeanor and the manner in which the prosecutor exercised his peremptory challenges, the implied finding, that the prosecutor's reasons for excusing [defendant], including the demeanor-based reason, were sincere and genuine, is entitled to 'great deference' on appeal. [Citations.] Nor have we found anything in the record to directly contradict the trial court's express findings to that effect." (*Reynoso, supra,* 31 Cal.4th at p. 926.)

21

Defendant argues the record contradicts the prosecutor's explanation that when she spoke to D.S., he had a bad attitude, he was grumpy, and D.S. had no connection with him. Defendant asserts the prosecutor's statement that she spoke to D.S. was untrue. The prosecutor never asked D.S. any questions or spoke to D.S. during voir dire. However, although the prosecutor did not question D.S. individually, she did question him while asking the jury panel questions as a whole. She likely would have been able to get a sense of D.S.'s demeanor while she was questioning the prospective jurors as a group, as well as from the court and defense counsels' questioning of the jurors.

Defendant further argues that D.S.'s response that a defendant might not want to testify because he would be "misunderstood," was not an odd response. But even if it could be construed as reasonable, the prosecutor explained why she thought the response was an odd answer. She indicated she had a hunch the response related to something in the back of D.S.'s mind, she was concerned he seemed grumpy, she did not have a connection with him, and D.S. seemed as if he did not to want to be there. The prosecutor's explanation was sufficient to support the trial court's finding that the prosecutor's reasons for removing D.S. were genuine and credible. Further questioning by the court was not required. A peremptory challenge may be based on a hunch. (*Chism, supra,* 58 Cal.4th at p. 1316; *People v. Johnson* (1989) 47 Cal.3d 1194, 1218.) An arbitrary exclusion is permissible, "'so long as the reasons are not based on impermissible group bias' [citation]. The basis for a challenge may range from 'the virtually certain to the highly speculative' [citation] and 'even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.]" (*Chism,* at p. 1316.)

22

Defendant argues the trial court stated it disagreed with the prosecutor's explanation for excusing the three jurors yet accepted them anyway, without inquiring further regarding the prosecutor's unsupported and implausible reasons. Although the trial court did not ask probing questions of D.S., the court stated it did observe that D.S. was "somewhat grumpy," and the prosecutor explained in sufficient detail why she was uncomfortable with leaving D.S. on the jury. The trial court was not required to inquire further. The prosecutor's reasons for excusing D.S. were plausible. There was thus substantial evidence supporting the trial court's determination that the prosecutor's reasons were sincere and genuine, rather than pretextual. This court must therefore give the trial court's findings deference, since the trial court was in a better position than this court to observe and evaluate D.S. and the prosecutor. (*Long, supra,* 189 Cal.App.4th at p. 845; *Lenix, supra,* 44 Cal.4th at p. 614.)

The trial court noted it did not objectively see anything wrong with D.S. as a juror, under the applicable *Batson/Wheeler* standard, the trial court found the prosecutor's removal of D.S. justified. The trial court stated, "I don't even agree with the standard, but again, I'm not here to make law from the bench. I think actually Justice Liu on the California Supreme Court is very critical of the standard. You may see that standard change at some point in time, but as of right now, it would appear as though Ms. Drake [the prosecutor] justified the excusing of Mr. D.S." Giving deference, as we must, to the trial court's finding that the prosecutor's race-neutral reasons for removing D.S. were genuine and sincere, and there being no direct contradictory evidence showing bias, we

23

conclude defendant has not established a *Batson/Wheeler* violation as to D.S.'s removal from the jury.

**B.K.**

Defendants made their *Wheeler* motion after the prosecutor excused B.K. Defendant argues on appeal that the record shows the prosecutor's justifications for excusing B.K. were pretextual because (1) there was evidence B.K. was not actually biased against law enforcement, (2) the prosecutor demonstrated disparate treatment by not dismissing an alternate juror with a similar psychiatric employment background to that of B.K., and (3) jurors' biases against law enforcement and defendant's drug history were irrelevant to defendant's case.

When the trial court asked the prosecutor to state her race-neutral reasons for excusing B.K., the prosecutor stated that her primary concern was that B.K. worked as the director of nurses at a psychiatric hospital. The prosecutor explained: "She's stated she was an RN, which is fine. We have other RNs or pharmacists on the jury. My concern is that she works at a psychiatric hospital. I think psychiatric hospitals in my limited experience – my brother is actually an EMT and works at psychiatric hospitals. My concern with that is law enforcement does come in there on a somewhat regular basis and sometimes they're not – the patients are not always treated with the utmost light hands or a lot of times the staff doesn't understand kind of what is going on and they take offense to how people are treated." Dorr acknowledged that the prosecutor seemed to be concerned B.K. might have "bias against the police because they're using too much force wherever she works." The prosecutor also stated she was concerned that B.K. would be

24

sympathetic to defendant because there was the possibility defendant's mother would testify that defendant had a history of abusing drugs and B.K. might dismiss defendant's actions and culpability because of his drug habit, which was why he committed the charged crimes.

Although the trial court found that removal of B.K. was "a bit of a stretch," the court acknowledged that the prosecutor's race-neutral justification, which was based on a subjective hunch that B.K. would be sympathetic to defendant's drug use, if put in issue, was proper. The court further noted that the prosecutor's hunch was speculative that B.K. had a negative view of law enforcement because of how law enforcement treated psychiatric patients when law enforcement brought patients in. The prosecutor noted that she had dismissed another prospective juror, E.P., who was a Hispanic male, for the same reason as B.K. .E P. worked at Patton as a registered nurse. The prosecutor said she had a hunch nurses at psychiatric hospitals did not like law enforcement, and her hunch was based on her experience speaking with jurors in previous hung jury cases.

A juror's occupation can be a permissible, nondiscriminatory reason for exercising a peremptory challenge. (*Chism, supra,* 58 Cal.4th at p. 1316; *People v. Trevino* (1997) 55 Cal.App.4th 396, 411; *People v. Landry* (1996) 49 Cal.App.4th 785, 790-791; *People v. Perez* (1996) 48 Cal.App.4th 1310, 1315; *People v. Barber* (1988) 200 Cal.App.3d 378, 394.) As in the instant case, "a prosecutor 'can challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected.' [Citation.]" (*Chism, supra,* 58 Cal.4th at p. 1317.) In addition, negative experiences with law

25

enforcement constitute a valid race-neutral reason for the prosecution exercising a peremptory challenge. (*People v. Turner* (1994) 8 Cal.4th 137, 171, overruled on different grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) A peremptory challenge may also be based on a hunch. (*Chism,* at p. 1316; *People v. Johnson, supra,* 47 Cal.3d at p. 1218.) Even an arbitrary exclusion is permissible, "'so long as the reasons are not based on impermissible group bias' [citation]. The basis for a challenge may range from 'the virtually certain to the highly speculative' [citation] and 'even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.]" (*Chism,* at p. 1316.) As long as a peremptory challenge is exercised in a nondiscriminatory manner, it may be based on speculation. (*Ibid.*)

Here, the prosecutor stated she believed B.K.'s employment as director of the nurses at a psychiatric hospital would render B.K. not the best type of juror to sit on the case. The prosecutor explained why she believed this. The trial court found that the prosecutor's race-neutral explanation was sincere and genuine, and not racially motivated. (*Chism, supra,* 58 Cal.4th at p. 1316.) The record supports this finding.

Defendant argues it is apparent the prosecutor's reasons for dismissing B.K. were pretextual because the prosecutor did not dismiss an alternate juror, referred to as TAJ2, who was employed as a psychologist for the public school system, and who had previously worked in neuropsychology hospital settings. TAJ2 differed from B.K., however, in that he was a psychologist, not a nurse, and he did not state he had direct contact with law enforcement, personally or professionally. In addition, he currently was working for the school district, rather than at a hospital, and was selected as an alternate

26

juror.

Defendant argues that the prosecutor's concern regarding juror bias against law enforcement was unfounded because such bias was irrelevant to defendant's case. Even though officer testimony may not have been crucial to proving defendant's criminal charges, three law enforcement witnesses were listed as trial witnesses and voir dire questioning by the court and counsel included questions concerning law enforcement. At trial, a law enforcement officer testified regarding locating Reyes's car after the incident and as to statements made by defendant to police the day after the incident. Possible bias against law enforcement was a relevant, valid race-neutral justification. We conclude there was substantial evidence in the record supporting the trial court's finding that the prosecutor's reasons for excusing B.K. were genuine and sincere.

## C. Probing Questioning by the Trial Court

Defendant asserts the trial court failed in its duty to inquire and evaluate the legitimacy of the prosecutor's race-neutral explanations for excusing the three prospective jurors, by determining whether valid reasons existed that "'actually prompted the prosecutor's exercise of the particular peremptory challenge.'" (*People v. Salcido, supra,* 44 Cal.4th at pp. 143-144; *People v. Fuentes* (1991) 54 Cal.3d 707, 720.) We disagree. The trial court asked clarifying questions when appropriate. The trial court was not required to "cross-examine" the prosecutor to determine the veracity of her explanations. By personally observing the prosecutor's demeanor in providing her explanations, the trial court presumably weighed the prosecutor's veracity and determined whether her explanations were legitimate, race-neutral reasons for excusing

27

the three jurors. Further questioning of a reason is only required where the explanation is implausible or suggests bias. (*Silva, supra,* 25 Cal.4th at p. 386; *Hall, supra,* 35 Cal.3d at pp. 168-169.)

Here, the prosecutor's reasons were plausible and did not suggest bias. Applying the appropriate deferential standard of review, we conclude that the prosecutor's race-neutral reasons were sufficiently plausible, there is substantial evidence supporting those reasons, and there is insufficient evidence in the record to support a determination that the three jurors were removed based on race. The record shows that the trial court properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising her peremptory challenges, sufficiently questioned the prosecutor regarding her reasons for exercising her peremptory challenges, and appropriately denied defendants' *Wheeler* motion.

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

HOLLENHORST
Acting P. J.

KING
J.

28